[No. 20178.   Department One.   January 8, 1927.]

SHERMAN, CLAY & COMPANY *et al., Appellants,* v.
EDWIN J. BROWN, *as Mayor, et al.,*
*Respondents.*[1]

[1] CONSTITUTIONAL LAW (33, 48)—POLICE POWER—DELEGATION OF POWERS—TO MUNICIPAL CORPORATIONS—REGULATION OF SECOND HAND DEALERS.  Under the police power, the city has authority to pass an ordinance regulating the sale of secondhand goods in view of Const. Art. 11, § 11, providing that a city may enforce within its limits local, police and other regulations that are not in conflict with other laws.

[2] MUNICIPAL CORPORATIONS (322)—POLICE POWER—DEALINGS IN PARTICULAR ARTICLES—REGULATION.  A city has power to regulate secondhand dealers, under a charter providing that it shall have power, within its limits, to regulate the carrying on of occupations which are of such a nature as to affect the public health or good order of the city.

[3] LICENSES (8, 9)—NECESSITY OF OBTAINING LICENSE—EXTENT OF BUSINESS.  The fact that a comparatively small portion of the business of a music house consisted in handling secondhand instruments does not exempt it from the operation of an ordinance regulating the sale of secondhand goods.

Appeal from a judgment of the superior court for King county, Douglas, J., entered February 25, 1926, in favor of the defendants, upon dismissing an action to restrain the enforcement of a city ordinance regulating secondhand dealers, tried to the court.  Affirmed.

*Roberts & Skeel* and *D. D. Mote,* for appellants.

*Thomas J. L. Kennedy* and *Ray Dumett,* for respondents.

MAIN, J.—Sherman, Clay & Company, a corporation, brought this action to restrain the enforcement of a city ordinance which sought to regulate the sale of secondhand goods.  After the action was instituted,

[1]Reported in 252 Pac. 137.

Hopper-Kelly Company intervened. The cause was tried to the court without a jury and resulted in a judgment dismissing the action, from which the plaintiff and intervener appeal.

The appellants for many years have been engaged in the sale of musical instruments in the city of Seattle. Neither of them purchase and pay cash for a secondhand instrument, but both of them take such instruments in exchange on the purchase price of a new instrument. Approximately five per cent of the business is of this character. The secondhand business of Sherman, Clay & Company during the year prior to the trial of the action amounted to approximately $65,000. On the first day of December, 1924, the city council passed ordinance No. 48022, which had for one of its purposes the regulation of the purchase, sale, trade, barter or exchange of secondhand goods. Section 199 of this ordinance provides:

"Any person who, within the city of Seattle, shall as a business, engage in the purchase, sale, trade, barter, or exchange of secondhand goods, other than 'junk' as defined in this ordinance, or any person who shall keep any store, shop, room or place where secondhand goods of any kind or description, other than 'junk' as defined in this ordinance, are bought, sold, traded, bartered or exchanged, is hereby defined to be a secondhand dealer, within the meaning of this ordinance."

Section 200 makes it unlawful for any person to engage in the business of secondhand dealer without first having obtained a license so to do. Section 202 requires every secondhand dealer to keep a book in which he shall at the time of purchase of any secondhand goods enter a description of the same together with the name, apparent age, signature and residence of the vendor. Section 203 provides that secondhand goods of any description bought or received by a secondhand

dealer must be held ten days, before they can be sold or offered for sale, except when the goods have been inspected by the members of the police department designed for that purpose, and they have authorized the dealer to dispose of them within a less period than ten days. Section 204 requires the secondhand dealer to make out and deliver to the chief of police, before the hour of noon on each day, a copy of the entries and transactions contained in the books of records relating to the business of the previous day.

In the case of *Sherman, Clay & Co. v. Brown*, 131 Wash. 679, 231 Pac. 166, it was held that the prior ordinance regulating secondhand dealers was void because it exempted from its operation dealers in stoves, furniture or the total contents of any room or house. After that decision, the present ordinance was passed, and, as indicated, the purpose of the present action is to test its validity.

[1] The first question is whether the city had power to pass such an ordinance. Section 11 of art. XI of the constitution of this state, among other things, provides that any city "may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws." With reference to that provision in *Detamore v. Hindley*, 83 Wash. 322, 145 Pac. 462, it was said:

"This is a direct delegation of the police power as ample within its limits as that possessed by the legislature itself. It requires no legislative sanction for its exercise so long as the subject-matter is local, and the regulation reasonable and consistent with the general laws."

Under the constitutional delegation of authority, the city had power to pass the ordinance. The regulation of the sale of secondhand goods in a municipality comes within the proper exercise of the police power.

In *Ex parte Holmes,* 187 Cal. 640, 203 Pac. 398, it is said:

"Secondhand goods, wares, and merchandise have always been deemed the proper subjects of police regulation by municipalities."

In *City of St. Louis v. Baskowitz,* 273 Mo. 543, 201 S. W. 870, it is said:

"Under these provisions of the charter the city was empowered to enact such police regulations as would insure the safety, health, comfort, and welfare of its citizens, and the protection of their persons and property; and it might be said that the city, independent of those charter provisions, has the inherent authority to enact such police regulations as may be necessary for the good government thereof and for the protection of its inhabitants. The authorities so holding are numerous. It has ever been held that the business of junk and secondhand dealers, as well as that of pawnbrokers, is of such character as to warrant police regulation. The reason for this is much stronger than it is for the regulation of ordinary merchants, brokers and commission men. Regarding the latter, their goods, merchandise, and securities are new and generally securely stored in some sanitary building or warehouse which largely keeps or protects them from disease germs and reduces the opportunities for theft to a minimum; whereas the junk or secondhand dealer purchases goods and personal property which is distributed among individuals throughout the inhabited world, and used for all purposes in the various avocations or walks of life, whether sanitary or not. This wide distribution and universal use of such property, in the very nature of things, makes it an easy object of theft, and is readily contaminated with the deadly germs of contagious and infectious diseases. I can conceive of nothing which would be more detrimental to the public health and good morals or render property more insecure, than the unregulated purchase, barter, and sale of such property.

"The foregoing observations somewhat differentiate the character of the two businesses or occupations, and

clearly show why the junk or secondhand dealer should be subjected to police regulations, and why such regulations are encouraged by the law, and upheld by the courts."

[2] If it be assumed, however, that the power of the city council must be derived from the charter the same result would follow. The charter provides among other things, that the city council shall have power within the corporate limits of a city to regulate the carrying on of occupations which are of such a nature as to affect the "public health or good order of the city . . ." The regulation of the business of dealing in secondhand goods has a direct relation to the good order of the city, as pointed out in the excerpt quoted from *City of St. Louis v. Baskowitz, supra.* In *Sherman, Clay & Co. v. Brown, supra,* with reference to the ordinance then before the court which was similar in its general purposes to that which we are now considering, it was said:

"It is apparent that this regulatory ordinance was passed with the purpose of preventing, or at least keeping check of, the disposition of stolen goods or otherwise improperly acquired personal property. It is common knowledge that when the way is made difficult for the thief and embezzler to find a ready market for the fruits of his endeavor that, to a large extent, his activities are curbed, and secs. 6 and 7, provide the means by which easy knowledge may be obtained by the police authorities of the location of goods improperly disposed of."

[3] It is next contended that the ordinance is not applicable to the appellants. The fact that a comparatively small portion of the business of the appellants is that of handling secondhand goods does not exempt them from the operation of the ordinance. The taking of secondhand musical instruments in exchange is a part of the regular business and is a substantial part

thereof, even though, when compared with the total business transacted, it is comparatively small. The handling of the secondhand instruments is more than nominal. The fact that the secondhand and new business is conducted in the same establishment does not affect the applicability of the ordinance. In *People v. Riverside Scrap Iron & Metal Co.*, 202 Mich. 469, 168 N. W. 424, it is said:

"It is also insisted that the junk business of the defendant is purely incidental to its main business, inasmuch as it consists of only 5 per cent. of its total business. We do not see how it is important that the junk business done by the defendant constitutes only a small percentage of its total business; for while, relatively, the percentage may be small, nevertheless the purchase of junk in wagonloads could hardly be called a negligible activity. Being engaged in the business admittedly of buying junk as a dealer, it clearly comes within the provisions of the ordinance, and a license should be required."

In *Lasley v. Dist. of Columbia,* 14 D. C. App. 407, it was held that the fact that the principal business of a dealer in bicycles was buying and selling new bicycles does not relieve him of the obligation to take out a license as a dealer in secondhand personal property, if he buys and sells secondhand bicycles.

The case of *Kehrer v. Stewart,* 197 U. S. 61, while different upon its facts, is identical in principle. It was there said:

"The record does not show what proportion of such business is interstate and what proportion is domestic, although it is conceded that most of the business is interstate in its character. If the amount of domestic business were purely nominal, as, for instance, if the consignee of a shipment made in Chicago upon an order filled there, refused the goods shipped, and the only way of disposing of them was by sales at Atlanta, this might be held to be strictly incidental to an inter-

state business, and in reality a part of it, as we held in *Crutcher v. Kentucky*, 141 U. S. 47; but if the agent carried on a definite, though a minor, part of his business in the State by the sales of meat there, he would not escape the payment of the tax, since the greater or less magnitude of the business cuts no figure in the imposition of the tax. There could be no doubt whatever that, if the agent carried on his interstate and domestic business in two distinct establishments, one would be subject and the other would not be subject to the tax, and in our view it makes no difference that the two branches of business are carried on in the same establishment.''

Neither do we think that the ordinance is unreasonable or oppressive in its provisions. It requires that the secondhand goods shall not be sold for a period of ten days. This, of course, was to allow an opportunity for the police department to make a full investigation of any transaction reported to them which may have occasioned their suspicion. The other provision with reference to making reports to the chief of police daily would be a direct aid in the locating of stolen property and probably in determining who the wrongdoer may have been.

The judgment will be affirmed.

TOLMAN, C. J., MITCHELL, FULLERTON, and HOLCOMB, JJ., concur.