**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.



FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JUL 2 0 2017
Fairhurst, CJ.
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on July 20, 2017

SUSAN L. CARLSON
SUPREME COURT CLERK

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| UNIVERSITY OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 94232-3 |
| | ) | |
| v. | ) | |
| | ) | EN BANC |
| CITY OF SEATTLE; | ) | |
| DOCOMOMO US – WEWA; | ) | Filed: JUL 2 0 2017 |
| HISTORIC SEATTLE; and | ) | |
| THE WASHINGTON TRUST FOR | ) | |
| HISTORIC PRESERVATION, | ) | |
| | ) | |
| Appellants. | ) | |
| | ) | |

YU, J.— The city of Seattle's (City's) municipal code includes a

"'Landmarks Preservation Ordinance'" (LPO), chapter 25.12 Seattle Municipal

Code (SMC). SMC 25.12.010. Pursuant to the LPO, property with significant

historical or cultural importance may be designated as landmark property. Once

property has been nominated for potential landmark designation, the LPO restricts

the owner's ability to make changes to that property. The University of

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Washington (UW) owns property in Seattle but contends that the LPO cannot apply to any property owned by UW (UW property). The City disagrees.

We must now resolve this disagreement. UW wanted to demolish a building on its Seattle campus, but that building was nominated for potential landmark designation pursuant to the LPO. UW therefore filed a declaratory judgment action asking for a judicial determination that the LPO cannot apply to any UW property as a matter of law.

As discussed below, all of UW's arguments either fail as a matter of law or cannot be decided in the first instance by a state court of general jurisdiction. Therefore, we reverse the trial court and remand for entry of summary judgment in favor of the City and DOCOMOMO US–WEWA (DOCOMOMO).[1]

FACTUAL AND PROCEDURAL BACKGROUND

The basis for the controversy currently before us dates back nearly 20 years. In 2000, UW prepared a draft campus master plan (CMP) that made UW's position clear: "The City landmarks ordinance is a local ordinance which is inapplicable to

---

[1] DOCOMOMO is a nonprofit group dedicated to the preservation of modern architecture. The name "is an acronym that stands for **Do**cumentation and **Co**nservation of Buildings, Site[s], and Neighborhoods of the **Mo**dern **Mo**vement." Clerk's Papers at 181. The nonprofit groups Historic Seattle and the Washington Trust for Historic Preservation intervened in this action by stipulation. All three nonprofits are represented by the same counsel and have filed joint briefing throughout the case, so this opinion refers to all three as "DOCOMOMO."

2

*Univ. of Wash. v. City of Seattle, et al.*, No. 94232-3

University property because it conflicts with the [Board of] Regent[s'] exclusive authority over its buildings." Clerk's Papers (CP) at 99.

UW ultimately agreed to an amended CMP, which the City approved, that memorialized the parties' disagreement without resolving it: "By adopting and approving the Master Plan, neither the University nor the City of Seattle waives or concedes its legal position concerning the scope of either party's legal authority to control or regulate University property." *Id.* at 277; *see also* UNIVERSITY OF WASHINGTON MASTER PLAN: SEATTLE CAMPUS 125 (Jan. 2003), http://cpd.uw.edu/sites/default/files/master-plan/2003_CMP/uw-2003-campus-master-plan.pdf [https://perma.cc/9T66-LF3W].

Since UW adopted its CMP in 2003, the applicability of the LPO came up in connection with UW's 2010 renovation of Husky Stadium and with a 2011 nomination of the Sand Point Naval Air Station for potential landmark designation. In both of those situations, UW chose to voluntarily comply with the LPO process but was careful to note that such voluntary compliance "neither waives nor concedes its legal position with regard to the City's regulatory jurisdiction over the University as an agency of the State of Washington." CP at 176.

The facts alleged in UW's complaint in this case are uncontroverted. In 2015, UW's Board of Regents (Regents) identified the More Hall Annex (Annex) for possible demolition, to be replaced with a new Computer Science and

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Engineering Building (CSE II). The Annex had been constructed in 1961 to house

UW's nuclear reactor. After the reactor was shut down in 1988 and UW's nuclear

engineering program ended four years later, the Annex sat vacant and unused. On

December 2, 2015, DOCOMOMO nominated the Annex for potential designation

as a landmark pursuant to the LPO. While the process of choosing the site for CSE

II continued, UW filed this declaratory action in King County Superior Court,

seeking a ruling that the LPO cannot apply to UW property as a matter of law.

On cross motions for summary judgment, the trial court ruled in favor of

UW, determining that the LPO "has no application because the University is not a

'person' or 'owner' as defined in the LPO." *Id.* at 609. The trial court expressly

did not consider any of the other issues presented. The City and DOCOMOMO

appealed.[2]

The Court of Appeals, Division One, certified the case for our direct review,

and our commissioner accepted certification pursuant to RCW 2.06.030 and RAP

4.4. Ruling Accepting Certification, *Univ. of Wash. v. City of Seattle*, No. 94232-

3, at 2 (Wash. Mar. 9, 2017). We accepted amici briefings supporting the City

---

[2] The City and DOCOMOMO did not seek a stay of the trial court's ruling pending appeal. Therefore, following the ruling, the City issued a demolition permit and UW demolished the Annex. However, we decide this case on the merits because it raises "a question of continuing and substantial public interest." *Klickitat County Citizens Against Imported Waste v. Klickitat County*, 122 Wn.2d 619, 632, 860 P.2d 390, 866 P.2d 1256 (1993) (citing *Sorenson v. City of Bellingham*, 80 Wn.2d 547, 558, 496 P.2d 512 (1972)).

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

from the Washington State Department of Archaeology and Historic Preservation, Futurewise, and the Washington State Association of Municipal Attorneys (WSAMA).

## ISSUES[3]

A.     Is the Regents' "full control" over UW property "except as otherwise provided by law," as expressed in RCW 28B.20.130(1), subject to limitation by applicable state statutes?

B.     If so, is UW a "[s]tate agenc[y]" that must comply with local development regulations adopted pursuant to the Growth Management Act (GMA) in accordance with RCW 36.70A.103?

C.     If so, is the LPO a local "development regulation[]" that was "adopted pursuant to" the GMA in accordance with RCW 36.70A.103?

D.     Is UW a property "'[o]wner'" as defined by SMC 25.12.200 such that the LPO applies to UW's Seattle property?

## STANDARD OF REVIEW

UW seeks a holding that the LPO can never apply to any UW property as a matter of law. There are no disputed material facts in this case, and all the

---

[3] The City raises the question of whether UW's CMP supplants the LPO. However, UW invokes the CMP only as evidence that it is unnecessary to apply the LPO to UW property. We therefore discuss the CMP to the extent that it is relevant to the other issues presented, rather than as a stand-alone issue.

5

questions presented require statutory and regulatory interpretation. Our review is

thus de novo. *Burns v. City of Seattle*, 161 Wn.2d 129, 140, 164 P.3d 475 (2007).

State statutes and local ordinances are subject to the same interpretive rules.

*Faciszewski v. Brown*, 187 Wn.2d 308, 320, 386 P.3d 711 (2016). Where the

meaning of a statute or ordinance is plain and unambiguous, we must "give effect

to that plain meaning as an expression of legislative intent." *Burns*, 161 Wn.2d at

140. "Plain meaning is discerned from viewing the words of a particular provision

in the context of the statute in which they are found, together with related statutory

provisions, and the statutory scheme as a whole." *Id.*

## ANALYSIS

UW and the City have been grappling over the LPO's applicability to UW

property since the City first adopted the LPO in 1977. *State v. City of Seattle*, 94

Wn.2d 162, 164-65, 615 P.2d 461 (1980). There is no question that UW's Seattle

property includes historically and culturally significant resources. The debate has

always centered on who has the authority to control those resources.

The last time we addressed this issue directly was in 1980. The court held

that the LPO could not apply to a portion of UW property as a matter of

constitutional law. *Id.* at 166. In the present case, however, the questions

presented are based on the interpretation of statutes and regulations that have been

substantially amended since *City of Seattle* was decided, so we must reconsider the

ultimate question of whether the LPO can apply to UW property in light of the current statutory language.

We hold that *City of Seattle* has been superseded in part by statute and that the LPO can, at least in some circumstances, be applied to UW property in Seattle. We therefore reverse and remand for the entry of summary judgment in favor of the City and DOCOMOMO.

A.    The Regents' control over UW property is subject to limitation by applicable state statutes

Both UW and its Regents are creatures of statute, with "no powers that are not conferred by statute, and none that the legislature cannot take away or ignore." *State v. Hewitt Land Co.*, 74 Wash. 573, 580, 134 P. 474 (1913). The first Washington State Legislature established "the University of Washington" and "vest[ed]" its governance in the Regents. LAWS OF 1889, ch. 12, §§ 1, 3, at 395, 96. Beginning in 1909, the legislature expressly granted the Regents "full control of the university and its property of various kinds." LAWS OF 1909, ch. 97, § 5, at 240.

That statutory language had not been amended when *City of Seattle* was decided in 1980, and the statute's strong, unequivocal language was a key factor in our decision. *City of Seattle*, 94 Wn.2d at 165 (citing former RCW 28B.20.130 (1977)). We began with the principle that municipal ordinances such as the LPO

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

cannot apply where they conflict with state statutes pursuant to article XI, section 11 of the Washington Constitution. *Id.* at 166.

Two state statutes were at issue in *City of Seattle*. The first was former RCW 28B.20.130(1), which, as noted, gave the Regents "'full control of the university and its property of various kinds.'" *Id.* at 165. The court also considered former RCW 28B.20.392(2)(b)(ii) (1969), which specifically gave the Regents the authority to "'to *raze, reconstruct, alter, remodel* or add to existing buildings,'" *id.* at 166, in the "Metropolitan Tract," which is "the original 10-acre parcel of land endowed to Washington Territory to establish a university, and now lies in the center of downtown Seattle," *id.* at 164. We held that applying the LPO to UW property in the Metropolitan Tract would conflict with both of those statutes and therefore that such application would be unconstitutional. *Id.* at 166.

However, in 1985, the legislature amended the statute regarding the Regents' control to provide that the Regents have "full control of the university and its property of various kinds, except as otherwise provided by law." LAWS OF 1985, ch. 370, § 92(1). That language remains in the current statute, codified at RCW 28B.20.130(1). In addition, the statute authorizing UW to raze its Metropolitan Tract buildings was repealed in 1999. LAWS OF 1999, ch. 346, § 8(2). Consequently, "the legal underpinnings of our precedent have changed or disappeared altogether," and we must consider the issue anew. *W.G. Clark Constr.*

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Co. v. Pac. Nw. Reg'l Council of Carpenters*, 180 Wn.2d 54, 66, 322 P.3d 1207 (2014).

The language of the current version of RCW 28B.20.130(1) is unequivocal: the Regents have "full control" over UW property "except as otherwise provided by law." When presented with such clear language, we must "'assume the Legislature meant exactly what it said and apply the statute as written.'" *Town of Woodway v. Snohomish County*, 180 Wn.2d 165, 174, 322 P.3d 1219 (2014) (quoting *Duke v. Boyd*, 133 Wn.2d 80, 87, 942 P.2d 351 (1997)). There can be little doubt that the plain language of RCW 28B.20.130(1) means that the Regents' control over UW property may be limited, at least, by other applicable state statutes.[4] The GMA is certainly a state statute. Whether it is applicable is discussed below.

Despite this plain language, UW argues that the legislature never intended to limit the Regents' plenary authority over UW property. As a matter of statutory interpretation, UW argues that the GMA is a "general law" that cannot "implicitly

---

[4] There may be a question as to whether the Regents' full control over UW property may be limited directly by *local* ordinances. In *City of Seattle*, UW argued "that a blanket rule of immunity applies to exempt state property from municipal regulations unless the legislature specifically provides otherwise." 94 Wn.2d at 166. This court "decline[d] to apply a rule of immunity, and [found] it unnecessary to express an opinion on the validity of such a rule." *Id.* at 167. We have since firmly rejected any such blanket immunity, holding instead that we must "'determine the intent of the Legislature when deciding whether a governmental unit is subject to a municipal zoning ordinance.'" *City of Everett v. Snohomish County*, 112 Wn.2d 433, 440, 772 P.2d 992 (1989) (quoting *Dearden v. Detroit*, 403 Mich. 257, 264, 269 N.W.2d 139 (1978)). However, this case concerns only applicable *state* statutes, not local ordinances.

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

amend" the Regents' full control over UW property. Br. of Resp't at 28 (boldface omitted). Relatedly, UW also argues that a "general law" cannot "alter prior enabling statutes that assign specific authority to individual state agencies." *Id.* at 36 (boldface omitted) (citing *Residents Opposed to Kittitas Turbines v. State Energy Facility Site Evaluation Council*, 165 Wn.2d 275, 309-10, 197 P.3d 1153 (2008)).

UW relies heavily on the "general-specific rule," which is a rule of statutory construction that "a specific statute will prevail over a general statute." *Residents Opposed*, 165 Wn.2d at 309. The general-specific rule is undoubtedly a sound principle of statutory construction where applicable. The problem is that before applying the general-specific rule, we must identify a conflict between the relevant statutes that cannot be resolved or harmonized by reading the plain statutory language in context. *Id.* at 309-10 (holding that RCW 36.70A.103 is a general statute that cannot apply in the face of a state statute that specifically and explicitly exempts alternative energy facilities from local regulation). Where such a conflict is presented, "[a] state agency cannot both preempt local laws and comply with such laws at the same time," and the more specific statute prevails. *Id.* at 309.

Here, there was no implicit amendment of RCW 28B.20.130(1), and there is no conflict between that statute and the GMA. The Regents' authority over UW property was *explicitly* amended in 1985, allowing the Regents to exercise full

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

control over UW property *"except as otherwise provided by law."* LAWS OF 1985, ch. 370, § 92(1) (emphasis added) (underlining omitted). This language unambiguously reflects a legislative decision that the Regents' authority is subject to limitation by applicable state statutes. Therefore, if the GMA is applicable, then the Regents' authority must yield unless there is a specific statute that conflicts with the GMA's application to a particular portion of UW's property. Any such conflict must be addressed in the context of a particular nomination for potential landmark designation or similarly specific facts.

UW also points to RCW 28B.20.700, which empowers the Regents "to provide for the construction, completion, reconstruction, remodeling, rehabilitation and improvement of buildings and facilities authorized by the legislature for the use of the university" as proof that it cannot be subject to the LPO via the GMA. Unfortunately for UW, this statute says nothing about *demolishing* any buildings, and it does not give the Regents any authority over buildings or facilities on UW property that were *not* authorized by the legislature for the use of the university. However, UW is seeking a holding that the LPO cannot *ever* be applied to *any* UW property in *any* way. There are certainly factual scenarios where the LPO might conflict with the Regents' specific authority and thus be inapplicable, but again, those scenarios must be considered in their specific factual contexts.

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Finally, UW points to legislative history, claiming that the legislature added the "'except as otherwise provided by law'" language in 1985 for the sole purpose of enabling the newly created, now-defunct Higher Education Coordinating Board to carry out its "authority to coordinate educational policy among the state's four-year institutions of higher education." Br. of Resp't at 29. But UW does not explain why we should look to legislative history even though the statute's meaning is unambiguous. We decline to do so. *Tingey v. Haisch*, 159 Wn.2d 652, 657, 152 P.3d 1020 (2007).

UW also raises a number of policy arguments. We may resist a plain meaning interpretation that would lead to absurd results, *Burns*, 161 Wn.2d at 150, but UW's policy-based arguments show only that UW views the consequences of RCW 28B.20.130(1)'s plain meaning as undesirable, not that we should view those consequences as absurd. There are competing, reasonable policy arguments that favor the City and DOCOMOMO. We do not attempt to resolve these competing policy arguments, but they do show that the plain meaning of the statute does not necessarily lead to absurd results.

UW relies on *City of Seattle* to demonstrate the legislature's "'intent that the decision-making power as to preservation or destruction of Tract buildings rests with the Board of Regents.'" Br. of Resp't at 12 (quoting *City of Seattle*, 94 Wn.2d at 166). This argument suffers from two fundamental problems. First, as

12

noted above, former RCW 28B.20.392(2)(b)(ii) was repealed in 1999. UW argues the repeal does not matter because when it repealed the statute, the legislature provided that "[n]othing in this act may be construed to diminish in any way the powers of the board of regents to control its property including, but not limited to, the powers now or previously set forth in RCW 28B.20.392." LAWS OF 1999, ch. 346, § 1. This would be a forceful argument if not for the second fundamental problem with UW's argument: the Annex building at issue in this case was located on the Seattle campus in the University District, not in the downtown Metropolitan Tract. Thus, the Regents' specific authority to raze Metropolitan Tract buildings pursuant to former RCW 28B.20.392 is inapplicable.

UW further claims support for its position from the fact that "the Legislature has appropriated funds both to demolish the Annex and to construct CSE II in its place." Br. of Resp't at 27. This assertion is misleading. UW cites as support for its assertion the declaration of UW's senior vice president of planning and management. That declaration actually states that the legislature appropriated funds to deactivate the Annex's nuclear facility in 2006 as required by federal law. Nine years later, in 2015, the legislature approved funding for construction of CSE II. There is no indication these funding grants were in any way related to each other or to the statutory interpretation issue before us now.

Finally, UW claims that its CMP already protects historical resources, so applying the LPO is unnecessary. This does nothing to advance UW's argument about the plain meaning of RCW 28B.20.130(1) as a matter of law. If UW feels that plain meaning was unintended or ill advised, it must take its concerns to the legislature.

Meanwhile, WSAMA's amicus brief lays out in detail the potential ramifications of a decision in UW's favor. WSAMA points to potential effects statewide, given "that the campuses of other colleges and universities are located within cities and towns," and those cities and towns have their own local development regulations that expressly contemplate application to higher education facilities. Br. of Amicus WSAMA at 5. WSAMA further contends that the statutes governing the control of these higher education facilities are "identical to the UW's authorizing legislation," such that "the careful balance established by other cities' codes will be upset, and . . . the legal dispute between the City and the UW could recur in another forum as a dispute between a different city and a different college or university." *Id.* at 6-7.

In addition to these widespread geographical implications, WSAMA notes that accepting UW's position may have widespread legal implications because the GMA's entire statutory scheme "is unworkable if development regulations are not applied equally." *Id.* at 16. According to WSAMA, a holding in UW's favor in

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

this case would not be limited to the context of historic preservation. Rather, the

GMA's entire scope would be called into question, potentially affecting such

broad, critically important areas as "protection of the environment and critical

areas, and providing for housing, transportation[,] water, sewer and stormwater."

*Id.* To that end, WSAMA contends that the plain language of RCW 28B.20.130(1)

shows that the legislature "acted conclusively to *rein in* the UW and put to rest the

UW's blanket immunity claim in [*City of Seattle*, 94 Wn.2d 162]." *Id.* at 10-11.

We do not attempt to resolve how these potential ramifications should be

balanced against UW's competing policy arguments, but WSAMA's concerns are

certainly reasonable enough to demonstrate that applying RCW 28B.20.130(1) as

written will not lead to absurd results. Accordingly, we hold that the plain

language of RCW 28B.20.130(1) provides that the Regents' control over UW

property is subject to limitation by other applicable state statutes.

B. UW is a state agency that must comply with local development regulations adopted pursuant to the GMA

UW next contends that even if the Regents' authority is subject to limitation

by applicable state statutes, the GMA is not an *applicable* state statute because UW

is not a "[s]tate agenc[y]" that "shall comply with the local comprehensive plans

and development regulations and amendments thereto adopted pursuant to" the

GMA. RCW 36.70A.103. The term "state agency" is not defined by either the

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

GMA or the regulations interpreting it. RCW 36.70A.030; WAC 365-196-200, -210. "When a statutory term is undefined, the words of a statute are given their ordinary meaning." *State v. Gonzalez*, 168 Wn.2d 256, 263, 226 P.3d 131 (2010). We hold that UW is a state agency within the plain and ordinary meaning of that term as it is used in RCW 36.70A.103.

At the risk of overstating the obvious, the plain and ordinary meaning of a "state agency" is an "agency of the state"—that is, an entity authorized to act on behalf of and under the control of the State of Washington. *See Bain v. Metro. Mortg. Grp., Inc.*, 175 Wn.2d 83, 106, 285 P.3d 34 (2012); RESTATEMENT (THIRD) OF AGENCY § 1.01 (AM. LAW INST. 2006). UW is an entity that is authorized to act on behalf of the State of Washington "to provide a liberal education in literature, science, art, law, medicine, military science and such other fields as may be established therein from time to time by the board of regents or by law." RCW 28B.20.020. To fulfill its mission, UW has been granted specific authority, *see generally* ch. 28B.20 RCW, which is subject to revision by the legislature, *Hewitt*, 74 Wash. at 580. UW is clearly a state agency as that term is ordinarily defined.

This ordinary meaning of a state agency is in no way undermined by the statutory context at issue. In fact, one limitation on the GMA's requirement that state agencies must comply with local development regulations is that "[n]o local comprehensive plan or development regulation may preclude the siting of essential

16

public facilities." RCW 36.70A.200(5). "Essential public facilities include . . . state education facilities." *Id.* at (1). This limitation would be superfluous if agencies concerned with siting state educational facilities, such as UW, were not required to comply with local development regulations at all.

Furthermore, the City points out that UW is a state agency for the purposes of many state laws, including "the Public Records Act and the Washington Law Against Discrimination, among others." City's Reply Br. at 6 (citing RCW 42.56.010(1); RCW 49.60.040(19)). Moreover, UW has consistently held itself out as a state agency in this and other cases. *See, e.g., City of Seattle*, 94 Wn.2d at 166-67 ("*Since the University is a state agency* and no statute expressly provides that the Tract is subject to local laws, the University argues that the Tract is immune from the city's landmarks ordinance." (emphasis added)); CP at 178 ("[T]he University neither waives nor concedes its position with regard to the City's regulatory jurisdiction over the University *as an agency of the State of Washington.*" (emphasis added)).

In response, UW contends that "[t]he Legislature expressly specifies where it intends the broad term 'state agencies' to include institutions of higher education." Br. of Resp't at 40 (boldface omitted). This is not necessarily the case. Certainly, some statutes are written to expressly include state universities when referring to state agencies. *See, e.g.*, RCW 70.175.070(2) (rural health

17

system project). However, some statutes are written to expressly *exclude* state universities. *See, e.g.*, RCW 41.06.133(1)(k)(iii) (state civil service law). And some statutes are written with the assumption that state universities are state agencies. *See, e.g.*, RCW 42.56.010(1) (Public Records Act); *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 884 P.2d 592 (1994) (plurality opinion) (applying the Public Records Act to UW). Thus, UW's argument that the legislature always specifies when it intends to include state universities as state agencies is simply not true.

UW is a state agency in accordance with the plain and ordinary meaning of that term, which is clearly appropriate given the statutory context of RCW 36.70A.103. Therefore, UW must comply with local development regulations adopted pursuant to the GMA.

C.      We do not address the merits of UW's argument that the LPO is not a local development regulation adopted pursuant to the GMA

UW next argues that even if it is required to comply with local development regulations adopted pursuant to the GMA, the LPO is not such a regulation because, according to UW, the LPO was not *properly* adopted in *compliance* with the GMA.[5] On this issue, UW's arguments must be addressed in the first instance

---

[5] The court requested supplemental briefing from the parties regarding the adoption of the LPO. After the parties filed their supplemental briefs, the City moved to admit additional evidence or to strike portions of UW's supplemental brief. This motion was passed to the merits and is now denied.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

by the Growth Management Hearings Board (GMHB). RCW 36.70A.280(1)(a); *Stafne v. Snohomish County*, 174 Wn.2d 24, 32, 271 P.3d 868 (2012). Therefore, if UW wants its arguments considered on the merits, it must file a petition with the GMHB. If the result is unfavorable, UW may then appeal to the superior court. *Stafne*, 174 Wn.2d at 38.

D.     UW is a property owner as defined by the LPO

Finally, we reach the specific issue on which the trial court based its ruling. The trial court agreed with UW that the LPO, by its own terms, cannot apply to UW property because UW is not a property "'owner'" as defined by the LPO. CP at 610. We reverse this determination because by failing to account for the regulatory context in which the LPO defines a property owner, the trial court applied an unreasonably technical and narrow definition of that term. We hold that UW is a property owner as defined by the LPO and therefore that the LPO's own language does not preclude its application to UW property.

Seattle's LPO creates a comprehensive regulatory scheme for historic preservation. There are procedural and substantive rules for every stage of the process: nominating property for potential landmark designation, considering such nominations and seeking input from the property owner and the public at large, approving or disapproving nominations, negotiating with the property owner regarding the controls that apply to landmark property and the incentives the

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

property owner will receive in return, and amending or repealing previous landmark designations. Thus, landmark designation is not automatically given to any nominated property that meets the minimum qualifications, and landmark designations may be reviewed to accommodate changed circumstances.

UW argues that its own historic preservation procedures are sufficient, if not superior, to the LPO, but whether UW is a property owner as defined by the LPO requires us to answer the very different question of what the city council intended. The LPO defines an "'[o]wner'" as "a person having a fee simple interest, a substantial beneficial interest of record or a substantial beneficial interest known to the [Landmarks Preservation] Board [(Board)] in an object, site or improvement." SMC 25.12.200. In turn, a "person" is defined as "an individual, partnership, corporation, group or association." SMC 25.12.220.

The City contends that UW is a person, and therefore an owner, because it is a corporation according to the ordinary meaning of that term as "a group of individuals acting collectively as a legal person, distinct from the individuals themselves, to exercise the powers bestowed upon it," City's Opening Br. at 26. UW does not dispute that it falls within the ordinary meaning suggested by the City. However, UW does argue that it is not a corporation because it is not organized pursuant to Title 23, 23B, or 24 RCW and the state legislation that

20

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

established UW in its present form does not use the word "'corporate'" or

"'corporation.'" Br. of Resp't at 18.

UW casts its interpretation as the only one that accords with the LPO's plain

language, but the LPO does not say "corporation organized pursuant to Title 23,

23B, or 24 RCW" or "corporation as established in its charter or enabling

legislation." It says only "corporation," a word that, as a general matter, may

reasonably be interpreted either ordinarily and broadly, as the City contends, or

technically and narrowly, as UW contends. The word alone, without any context,

does not tell us which interpretation was intended by the city council. Therefore,

before declaring the word's plain meaning, we must consider the context in which

it is used. *Burns*, 161 Wn.2d at 140; *Tingey*, 159 Wn.2d at 658 (if a word has both

ordinary and technical meanings, the technical meaning is applied only if the

context shows that the word is being "used in its technical field"). It is apparent

from the context that "'[o]wner,'" "'[p]erson,'" and "corporation" were intended to

be interpreted according to their broad, ordinary meanings. SMC 25.12.200, .220.

First looking to the definitions themselves, a narrow and technical

interpretation simply does not make sense. An "'[o]wner'" is not restricted to a

legal owner, but rather includes anyone with "a fee simple interest, a substantial

beneficial interest of record or a substantial beneficial interest known to the

Board." SMC 25.12.200. Similarly, a "'[p]erson'" includes, among others, a

21

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

"group or association," words that, to the best of our knowledge, do not have technical legal meanings. SMC 25.12.220.

Second, when read in the complete regulatory context of the LPO, these terms are not defined for the purpose of limiting the LPO's intended reach, as UW contends. Rather, they are defined for the purpose of ensuring that anyone whose property rights may be affected by an action pursuant to the LPO is given proper notice of his or her substantive and procedural rights and obligations. Effecting this purpose requires that the words be interpreted according to their broad, ordinary meanings.

The LPO provides that "[a]ny person including the Historic Preservation Officer and any member of the Board may nominate *any* site, improvement or object for designation as a landmark." SMC 25.12.370(A) (emphasis added). Once property has been nominated, the LPO's standards for approving landmark designation are as follows:

> An object, site or improvement which is more than twenty-five (25) years old may be designated for preservation as a landmark site or landmark if it has significant character, interest or value as part of the development, heritage or cultural characteristics of the City, state, or nation, if it has integrity or the ability to convey its significance, and if it falls into one (1) of the following categories:
> A. It is the location of, or is associated in a significant way with, an historic event with a significant effect upon the community, City, state, or nation; or
> B. It is associated in a significant way with the life of a person important in the history of the City, state, or nation; or

22

        C.     It is associated in a significant way with a significant aspect of the cultural, political, or economic heritage of the community, City, state or nation; or

        D.     It embodies the distinctive visible characteristics of an architectural style, or period, or of a method of construction; or

        E.     It is an outstanding work of a designer or builder; or

        F.     Because of its prominence of spatial location, contrasts of siting, age, or scale, it is an easily identifiable visual feature of its neighborhood or the City and contributes to the distinctive quality or identity of such neighborhood or the City.

SMC 25.12.350. The criteria for nominating and approving property for landmark designation thus do not address what type of entity owns the property. Instead, *any* person is permitted to nominate *any* object, site, or improvement within the City's geographical jurisdiction for landmark designation, which may be approved if the property meets the criteria of SMC 25.12.350.

Meanwhile, in literally every instance where the LPO *does* use the word "owner," it is in a provision for giving notice to those whose property rights may be affected or in a provision advising property owners of their substantive and procedural rights and obligations. None of these provisions distinguish between different types of owners; the rights and obligations of an individual are the same as those of a partnership, corporation, group, or association. SMC 25.12.120 (economic incentives and compensation for affected property owners), .210 (property owner is a party of record), .320(E) (Historic Preservation Officer shall "encourage and advise owners"), .320(H) (Historic Preservation Officer shall

23

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

"grant certificates of approval all without prejudice to the right of the owner at any time to apply directly to the Board"), .380 (providing for service on the owner of notice of public meetings where the Board considers whether to take further action on a nomination), .400 (providing for service of notice on the owner if the Board approves landmark designation), .440 (providing for service on the owner of the Board's report and the LPO's negotiation procedures for approved landmark designations), .490-.570, .610, .630 (providing procedures for the owner to negotiate with the Board regarding controls and incentives if landmark designation is approved and for review of any controls or incentives by a hearing officer and then by the city council), .580-.600 (providing that owners may not be deprived of reasonable economic use of their property), .650-.660 (providing for notice to the owner of ordinances designating landmark property and of any intended amendment or repeal of such ordinances), .670-.680, .720-.730, .750-.770 (procedures for obtaining approval for making alterations to property nominated for landmark designation), .835 (conditions under which an owner may demolish landmark property), .840 (general provisions for service of notice on the owner), .850 (situations where proceedings on a landmark nomination will be terminated), .860 (owner's right to seek revocation or alteration of designation, incentives, and controls), .870 (owner's right to copies of staff reports and studies), .900 (owner's right to request advice from the Board).

24

Thus, when the plain language is considered in context, the city council's clear purpose in defining an owner was to ensure that everyone with the right to notice receives it and is made aware of his or her substantive rights and obligations. UW's technical, narrow interpretation does not reflect this purpose.

UW, however, contends that the broad, ordinary interpretation advanced by the City would lead to absurd results because it is "so broad [it] would include the state and federal government even though neither are corporations as that term is commonly understood." Br. of Resp't at 21. To the extent that UW's concern is that this would allow the LPO to apply to all state and federal property, it is undisputed that the LPO cannot apply where it actually conflicts with state or federal law. And to the extent that the LPO can apply to state and federal property without conflicting with state or federal law, there is no reason to deprive the state or federal government of the same substantive and procedural rights and obligations afforded to other property owners by the LPO.

Considered in context, it is clear that the LPO's definition of "owner" should be broadly construed in order to ensure that it serves the purposes for which it was intended. UW properly does not dispute that it is a corporation, and thus a person, and thus an owner, under a broad reading. We therefore reverse the trial court's ruling on this issue.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

## CONCLUSION

The Regents enjoyed over a century of plenary authority over UW property. It is understandable that UW is resistant to changing that structure. It is also understandable that UW takes offense at any suggestion that it does not sufficiently value its own historical resources. However, it is up to the legislature, not UW, to grant, expand, restrict, or rescind the Regents' authority. The plain language of the current statutes provide that the Regents' authority is subject to limitation by applicable state statutes, including the GMA's provision that state agencies must comply with local development regulations adopted pursuant to the GMA. UW property that is located in Seattle is thus potentially subject to the LPO absent a specific, directly conflicting statute. Accordingly, we reverse the trial court's grant of summary judgment in favor of UW and remand for entry of summary judgment in favor of the City and DOCOMOMO.

*Univ. of Wash. v. City of Seattle, et al.*, No. 94232-3

WE CONCUR: